OPINION
{¶ 1} The appellant-plaintiff, Esther Chelsea, appeals the January 24, 2002 judgment entry of the Court of Common Pleas of Marion County, Ohio, granting summary judgment in favor of the appellees, Dr. Craig Thompson and Smith Clinic, as to the medical malpractice action against them.
 {¶ 2} Esther Chelsea was injured in an automobile accident on January 31, 1997, while traveling as a passenger in a vehicle operated by Patricia Cramer. Esther was transported to the emergency room of a nearby hospital, where doctors discovered that her hip was dislocated and her right clavicle was fractured. She was then treated and released. During a follow-up examination two weeks later, x-rays revealed that Esther's left clavicle was also fractured.
 {¶ 3} In April 1997, Esther experienced unsteadiness, dizziness, and a headache and was admitted to Marion General Hospital, where she was clinically diagnosed as having suffered a mild stroke. On April 24, 1997, Esther was transferred to MedCenter Hospital for rehabilitation. On the evening of May 2, 1997, Esther began complaining of pain in her left arm. Nurses observed throughout the night that the pulse in her left arm was weak, that the arm was cool to the touch and pale, and that Esther's nail beds were cyanotic (darkened). In addition, the nurses' chart regarding Esther indicates that Dr. Thompson, who was the physician on-call that night, was notified of the condition of her arm at 11:55 p.m. on May 2, 1997, but only ordered that Vasotec for her hypertension be administered. This chart also reflects that he was notified of her condition again at 8:40 a.m. on May 3, 1997, but gave no further instructions as to her care. Dr. Thompson then examined Esther at 10:15 that morning. At 11:20 a.m., a Dr. Malek reviewed Esther's chart, an arteriogram was ordered of her arm, and the doctors discovered that a blood clot had formed in Esther's left arm. Emergency surgery was then performed to remove the clot and restore blood flow. Although the surgery was successful, Esther's arm suffered significant damage from the lack of proper blood flow. Subsequently, Esther was transferred to a nursing home, where she remained until July 31, 1997.
 {¶ 4} Esther originally filed suit against Patricia Cramer for negligence on January 28, 1999. The case then proceeded to discovery. On November 29, 1999, a deposition was taken of Dr. Jose Vale, the vascular surgeon who performed the surgery to remove the blood clot in Esther's arm. During this deposition, Dr. Vale testified that the condition of Esther's arm on May 2, 1997, and continuing into the morning of May 3, 1997, indicated a lack of blood supply that required immediate attention. In addition, Dr. Vale testified that Esther's arm had probably been without a proper blood supply for over six hours at the time he examined her, which could disable a patient, and that a patient with her symptoms should have had prompt medical attention in order to prevent damage to the limb.
 {¶ 5} Based upon the statements of Dr. Vale, counsel for Esther Chelsea amended the complaint on April 14, 2000, to include, inter alia, a claim for medical malpractice against the appellees, Dr. Thompson and Smith Clinic, for failing to timely and adequately treat Esther. The amended complaint also included a claim for fraud, alleging that Dr. Thompson falsely stated that Esther's hospitalization, medical treatment, and care for her arm after May 3, 1997, were incurred as a direct result of the automobile accident rather than as a result of his delay in caring for her. Thereafter, the appellees filed a motion for summary judgment as to all claims against them on May 2, 2001. Counsel for Esther then responded to this motion and filed a motion for summary judgment as to the statute of limitations issues. On January 24, 2002, the trial court granted summary judgment in favor of the appellees on the medical malpractice claim, finding that it was filed beyond the statute of limitations. However, the trial court denied summary judgment as to the fraud claim. Thereafter, the count of fraud was voluntarily dismissed by the plaintiff and all other parties were dismissed from the action. This appeal followed, and Esther now asserts five assignments of error.
 {¶ 6} "The trial court erred in granting Defendants-Appellees' motion for summary judgment on the grounds that Plaintiff-Appellant's medical malpractice claim was untimely filed under Ohio Rev. Code §2305.11(B)."
 {¶ 7} "The trial court erred in not finding that the question of the existence of a cognizable event that starts the medical malpractice statute of limitations running is one of disputed fact to be decided by the trier of fact."
 {¶ 8} "The trial court erred in not finding that the `cognizable event' in the instant case occurred when Plaintiff-Appellant discovered, through the deposition of Dr. Vale in November 1999 during the initial lawsuit, that Dr. Thompson had erroneously diagnosed her medical condition."
 {¶ 9} "The trial court erred in not finding that reasonable minds could conclude that Plaintiff-Appellant filed her medical malpractice claim within one year of the discovery of the `cognizable event.'"
 {¶ 10} "The trial court erred in not finding that Defendant-Appellees' fraudulent concealment of their own negligence tolled the running of the statute of limitations for Plaintiff-Appellant's medical malpractice claim."
 {¶ 11} These five assignments of error all relate to the grant of summary judgment based upon the statute of limitations. Thus, they will be discussed together. The primary contention asserted by Esther in these assignments of error is that the trial court incorrectly found that the cognizable event, which would trigger the running of the statute of limitations for a claim of medical malpractice, conclusively occurred when she left the nursing home on July 31, 1997. Rather, Esther maintains that the cognizable event occurred in November 1999, when Dr. Vale was deposed, or in the alternative, a genuine issue of material fact exists as to the date of the cognizable event.
 {¶ 12} The standard for review of a grant of summary judgment is one of de novo review. Lorain Nat'l Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. Thus, such a grant will be affirmed only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, "summary judgment shall not be rendered unless it appears * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence construed most strongly in his favor." Id.
 {¶ 13} The moving party may make his motion for summary judgment in his favor "with or without supporting affidavits[.]" Civ.R. 56(B). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." Mitseff v. Wheeler
(1988), 38 Ohio St.3d 112, syllabus. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 360. Once the moving party demonstrates that he is entitled to summary judgment, the burden then shifts to the non-moving party to show why summary judgment in favor of the moving party should not be had. See Civ.R. 56(E). In fact, "[i]f he does not so respond, summary judgment, if appropriate, shall be entered against him." Id.
 {¶ 14} The Ohio Revised Code provides that "an action upon a medical * * * claim shall be commenced within one year after the cause of action accrued[.]" R.C. 2305.11(B)(1). The Ohio Supreme Court has previously determined "that a cause of action for medical malpractice accrues and the R.C. 2305.11 limitations period begins to run either (1) when the patient discovers or, in the exercise of reasonable care and diligence should have discovered, the resulting injury, or (2) when the physician-patient relationship for that condition terminates, whichever occurs later." Akers v. Alonzo (1992), 65 Ohio St.3d 422, citing Oliverv. Kaiser Community Health Found. (1983), 5 Ohio St.3d 111, syllabus;Frysinger v. Leech (1987), 32 Ohio St.3d 38, paragraph one of the syllabus. "A patient `discovers' or `should have discovered' his or her injury upon the happening of a `cognizable event.'" Carpenter v.Kindig, 3rd Dist. No. 1-01-128, 2002-Ohio-1020, at ¶ 10.
 {¶ 15} A cognizable event is one "which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies."Allenius v. Thomas (1989), 42 Ohio St.3d 131, syllabus. However, a "patient need not be aware of the full extent of the injury before there is a cognizable event." Carpenter, 2002-Ohio-1020, at ¶ 12 (citation omitted). "It is enough that some noteworthy event, the `cognizable event,' has occurred which does or should alert a reasonable person-patient that an improper medical procedure, treatment or diagnosis has taken place." Allenius, 42 Ohio St.3d at 134. These standards indicate that the determination of when a cause of action accrues and the statute of limitations begins to run involves an analysis of the facts on a case-by-case basis. See Shadler v. Purdy (1989), 64 Ohio App.3d 98,103.
 {¶ 16} Applying the case law to the facts of this case and construing the evidence in Esther's favor, we conclude that a question of fact remains as to when Esther's cognizable event occurred. The medical records before this Court do not conclusively establish that Esther's injury was attributable to the delay in her treatment by Dr. Thompson. There is some question as to whether the post-operative report of Dr. Vale has been properly entered into the record of the trial court. However, for purposes of our de novo review of the summary judgment, we have chosen to give the benefit of the doubt to the appellees and have included the report in our review of the medical records. This report makes reference to an effort to discuss the emergency nature of the surgery with Esther just prior to the surgery without a description of the exact circumstances of that conversation. While these circumstances may be appropriate for exploration before a trier of fact, the statement from the post-operative report standing alone does not, in our view, conclusively establish a "cognizable event" sufficient to support a summary judgment.
 {¶ 17} Moreover, Dr. Thompson's letters to counsel for Esther indicate that her surgery, hospitalization therefore, subsequent rehabilitation, and stay at the nursing home were "required as a direct result of treatment from injuries she sustained in the January 31, 1997 collision" rather than relating the extent of her arm injury and rehabilitation for that injury to the delay in medical treatment that he provided as Dr. Vale's deposition suggested. Dr. Thompson further opined in his letters to counsel for Esther that her clavicular fracture "distorted the arterial blood flow of the left subclavian artery and the left brachial artery supplying the left arm. This ultimately required surgical intervention * * * and the result [sic] inpatient hospitalization as well as subsequent outpatient physical therapy." Thus, it appears that Esther may have had good reason to believe from Dr. Thompson's representations that the injuries sustained in the automobile accident led to the subsequent injury to her left arm and the rehabilitation that followed.
 {¶ 18} The trial court found and the appellees argue that Esther experienced pain and was aware of the extent of her injury after she left the care of East Lawn Nursing Home on July 31, 1997, and that these facts should have put her on notice as of that date that her complaints were related to the delay in treatment by Dr. Thompson on May 2-3, 1997. Thus, the appellees maintain that Esther had a duty as of July 31, 1997, to determine whether the injury suffered was the proximate result of malpractice and to ascertain the identity of the tortfeasor. See Flowersv. Walker (1992), 63 Ohio St.3d 546, syllabus. However, this theory would require any person with pain after surgery to suspect negligence and pursue litigation. Ohio courts have made the same observation and cautioned against speculating as to what a patient should have surmised from his or her pain. See Id. at 550 (a patient can have an injury without having reason to believe that it was caused by malpractice);Fisher v. Deerhake (1987), 41 Ohio App.3d 139, 141 (pain is a natural consequence of surgery and is not sufficient to immediately put the patient on notice that an injury resulted from malpractice).
 {¶ 19} The appellees further point out that Esther was aware of the pain in her arm and other symptomatology of her arm on May 2-3, 1997, that Dr. Thompson delayed her treatment for a number of hours, that she required emergency surgery, and that her arm sustained injury. Thus, they contend that this knowledge, acquired on May 3, 1997, also placed a duty upon her to be diligent and make inquiry as to whether the delay amounted to malpractice. However, this argument ignores the fact that "the causes of medical problems * * * are not within the realm of a layman's knowledge." Herr v. Robinson Mem. Hosp. (1990), 49 Ohio St.3d 6,9. Patients are entitled to rely on the judgment of their doctors. To suggest that this reliance is unreasonable would impair the doctor-patient relationship. Id.
 {¶ 20} In this case, Esther relied upon Dr. Thompson's skill and knowledge as a physician to make the determination as to how to properly treat her arm. Thus, Esther may have had no reason to believe that Dr. Thompson was doing anything other than properly treating her condition by observing her throughout the night and later determining that her arm had reached the point where it now required surgical intervention. In addition, the record does not reflect, nor do the appellees suggest, that the vascular surgeon, Dr. Vale, ever gave her any indication until his deposition that the delay in treatment caused her injury. Likewise, there is no evidence that Esther was given any specific indication from any other source before November 1999 that her pain and injury were related to the delay in treatment of the blood clot by Dr. Thompson.
 {¶ 21} We have previously noted that plaintiff has voluntarily dismissed the allegations of fraud against Dr. Thompson. Moreover, we specifically refrain from any determination as to whether fraudulent concealment, in and of itself, tolls the statute of limitations in a medical malpractice action. However, we do find that the actions of Dr. Thompson, Dr. Malik, and Dr. Vale, as well as the medical records before this Court could lead reasonable minds to differ as to whether Esther should have been aware before November 1999, that her pain and injury were related to the delay of treatment by Dr. Thompson.
 {¶ 22} In sum, we believe the appellees have failed to satisfy their burden for summary judgment by establishing that Esther should have known through her medical records or post-operative pain alone that her injury was related to the delay in Dr. Thompson's treatment. On the other hand, there is a genuine issue of material fact as to whether Esther should have been on notice of a potential malpractice claim prior to November of 1999. As a result, summary judgment was improper as to either party, and we find that a genuine issue of material fact remains as to whether Esther timely filed her complaint.
 {¶ 23} Based upon the foregoing discussion, we find that the first and fourth assignments of error are sustained. The second assignment of error is sustained to the extent that a genuine issue of material fact exists in the case sub judice as to the existence of the cognizable event. The third assignment of error is overruled. The fifth assignment of error is overruled to the extent it advances a proposition of law and to the extent it is based on a cause of action that has been dismissed in the trial court. However, as previously indicated, the actions of Dr. Thompson, however characterized, may well be relevant to the factual determination as to when Esther should have first become aware of a potential malpractice claim.
 {¶ 24} The judgment of the Court of Common Pleas of Marion County, Ohio, is reversed and the matter is remanded to that court for further proceedings in accordance with this opinion.
Judgment reversed and cause remanded.
 BRYANT and HADLEY, JJ., concur.